# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **TRAVIS CULLITON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:23-cv-00246** |
| | ) | **Judge Aleta A. Trauger** |
| **CASEY FIDDLER,** | ) | |
| **MICHAEL THOMAS,** | ) | |
| **JEFF CARROLL, and CITY OF** | ) | |
| **MURFREESBORO, TENNESSEE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 34) filed on behalf of defendants Casey Fiddler, Michael Thomas, Jeff Carroll, and the City of Murfreesboro, Tennessee, seeking dismissal of all claims asserted against them in the Complaint (Doc. No. 1) filed by plaintiff Travis Culliton. For the reasons set forth herein, the motion will be granted in part and denied in part.

## I.    LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

In moving for or responding to a motion for summary judgment, the "party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or

presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* "[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume the truth of the nonmoving party's evidence and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving

party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

## II.     FACTS AND PROCEDURAL HISTORY[1]

### A.     The Traffic Stop on March 18, 2022

Plaintiff Travis Culliton is a citizen of Colorado. (Culliton Dep. 18, Doc. No. 37, at 5.)[2] On March 18, 2022, he was driving through Murfreesboro, Tennessee from Colorado, on his way to Georgia. (*Id.* at 31, Doc. No. 37, at 8.) By approximately 11:00 p.m., he had been driving for nearly eighteen hours and had been looking (unsuccessfully) for a hotel room. (*Id.* at 32–33, Doc. No. 37, at 9–10.) Just prior to the encounter with the defendant police officers that gave rise to this lawsuit, he had stopped at three hotels on a strip on Old Fort Parkway in Murfreesboro, checking for availability. (*Id.* at 34–35, Doc. No. 37, at 11–12.) He pulled out of a hotel parking lot onto Chaffin Lane and then waited at a traffic light to turn onto Old Fort Parkway. (*Id.* at 36, Doc. No. 37, at 13.) Culliton acknowledges that a light over the license plate on his vehicle was out. (*Id.* at 139, Doc. No. 37, at 28; *see also* Doc. No. 38-6.) He also had a "Black Lives Matter" bumper sticker displayed below his license plate. (Doc. No. 38-6.)

Defendant City of Murfreesboro ("City") maintains a police department (the "MPD"). In March 2022, defendants Casey Fiddler and Michael Thomas were both patrol officers with the MPD in the Directed Patrol Unit. At around 11:20 p.m. on March 18, 2022, Fiddler and Thomas were travelling in separate patrol vehicles on Chaffin Place and approaching the intersection of

---

[1] The facts set forth herein for which no citation is provided are drawn from the plaintiff's Response to the Defendants' Statement of Undisputed Material Facts (Doc. No. 44) and are undisputed for purposes of the Motion for Summary Judgment.

[2] The defendants improperly filed multiple deposition transcript excerpts as a single scanned (and unsearchable) document, making it difficult either to cite them with clarity or to locate them. The court cites herein both the original deposition transcript page and the page within the larger document where the cited portion can be located.

Old Fort Parkway. (Fiddler Dep. 5–6, Doc. No. 37, at 31–32; Thomas Dep. 5, Doc. No. 37, at 59.) Officer Fiddler was behind Culliton as Culliton turned left from Chaffin Lane onto Old Fort Parkway. Fiddler decided to initiate a traffic stop of the plaintiff's vehicle after having seen him partially pull out of a parking lot onto Chaffin Lane without yielding, almost striking Officer Thomas's vehicle, and after observing the missing light above the license plate. (Fiddler Dep. 5–8, Doc. No. 37, at 31–34.) After turning left onto Old Fort Parkway behind Culliton, Fiddler activated his blue lights.

As shown on the video of the incident captured by Fiddler's dash camera (manually filed as Exhibit D to the defendants' Motion for Summary Judgment) ("Video"), Culliton did not stop his vehicle for several hundred feet after Fiddler activated his lights.[3] Fiddler testified that the length of time it took for Culliton to stop, on top of his nearly striking Officer Thomas's vehicle, raised a concern that Culliton might be driving under the influence. (Fiddler Dep. 9–10, Doc. No. 37, at 35–36.) After both vehicles had stopped, Fiddler approached the driver's side of Culliton's car and stated, "Good evening, I'm Officer Fiddler, Murfreesboro Police Department. If you will, roll your window down for me." (Video at 23:23:34.) The plaintiff's response is not audible from the Video, but he testified that he responded, "It is down," because it was down enough, in his opinion. (Culliton Dep. 46, Doc. No. 37, at 15.) Fiddler repeated, "Roll your window the rest of the way down for me." (Video at 23:23:40.) According to Culliton, the window was already down "a third of the way," or four to six inches, and he refused to roll it down further because he has anxiety and does not like people being close to him, and he felt that Fiddler was being "kind of

---

[3] The dash camera video shows that Culliton started to pull over where an interstate off-ramp joined Old Fort Parkway, just before the road crossed over Interstate 40, but then kept going until he was on the other side of the bridge crossing the interstate and could pull all the way off the road.

demanding." (Culliton Dep. 45–46, Doc. No. 37, at 14–15.) The Video reflects that Fiddler's tone was calm and respectful.

When the plaintiff refused to roll the window down further, Fiddler opened the driver's side door and asked Culliton to step out of his vehicle. (Video at 23:23:42.) Fiddler testified that he wanted the plaintiff to exit the vehicle, in part, because he could not effectively communicate with him and because he "needed to be able to speak with him to be able to determine if he was trying to conceal an odor of alcohol. (Fiddler Dep. 18, Doc. No. 37, at 44.)

Fiddler asked Culliton to step out of his vehicle twice. Culliton can be heard to exclaim, "For what?" (Video at 23:23:47.) The third time, Fiddler states, "Step out of the vehicle, or I'm going to remove you from the vehicle." (*Id.* at 23:23:48.) When the plaintiff did not move to exit his vehicle, Fiddler reached in and "took hold of his arm" to remove Culliton from the car. (Fiddler Dep. 21, Doc. No. 37, at 46.) While he was removing Culliton from his car, Fiddler repeated his request that Culliton "step out of the vehicle" four more times. (Video at 23:23:48–23:24:00.) The Video does not show in great detail what transpired when Fiddler began trying to get Culliton to exit his vehicle, but it is apparent that Culliton objected verbally, and he appears to have physically, if briefly, resisted and tried to push away from Fiddler for the seven or eight seconds it took for Fiddler to get him to stand up. (*See* Video at 23:24:51–23:24:59.) While Culliton denies having any "physical response" when Fiddler reached for him and asserts that he would not "physically resist" someone with a gun, his version of events is not supported by the Video. (*See* Culliton Dep. 54, Doc. No. 37, at 16.)

Fiddler testified that Culliton "committed a crime" "[w]hen he resisted [Fiddler's] lawful order to exit the vehicle and then [Fiddler] had to physically remove him from the vehicle." (Fiddler Dep. 21, Doc. No. 37, at 46.) He concedes that Culliton did not actually "fight" him when

he physically removed him from the vehicle, but he "pulled away" as Fiddler was trying to physically remove him from the vehicle. (*Id.*) The video shows that Fiddler was not rough or aggressive in attempting to get Culliton out of his car and that Culliton eventually stood up out of the car without being physically pulled, although Fiddler's hands were still on him. (*See* Video at 23:23:51–23:24:00.)

Once Culliton was out of his car, Fiddler asked him to turn around and put his hands on the hood and then to put them behind his back to be handcuffed. (*Id.* at 23:24:00–23:24:07.) He informed Culliton that he was being "detained" for "resisting." (*Id.* at 23:24:13.) Throughout the encounter, Culliton was clearly angry and agitated; he vociferously protested and questioned what was happening and why he had been stopped, but he never gave Fiddler an opportunity to answer any of his questions. Fiddler remained calm throughout the encounter.

Shortly after being handcuffed, Culliton stated, "You are hurting my wrists. What the fuck is this about?" (*Id.* at 23:24:36.) Fiddler responded, "So let's check it out, okay?" (*Id.* at 23:24:38.) Culliton continued to ask why he was being detained and to argue and interrupt when Fiddler tried to explain. When Culliton exclaimed, "This is fascist bullshit," Fiddler did not respond except to ask, "What's your name, man?" (*Id.* at 23:25:34–23:25:35.)

Culliton refused to give his name, stating he did not need to until Fiddler told him "what [he was] being arrested for." (*Id.* at 23:25:38.) Fiddler responded, "You do have to give me your name; I stopped you for a traffic offense, okay." (*Id.* at 23:25:40.) Culliton stated, "Then you should have asked me for my license not pulled me out of my car." (*Id.* at 23:25:37.) He finally gave his first name, Travis, and repeated that the handcuffs were too tight and hurting his wrists.

Fiddler checked the cuffs and stated, "So look, I can still fit two fingers inside of there."[4] (*Id.* at 23:25:55.) Culliton stated that he could not move his hand.

Fiddler asked Culliton where his driver's license was, and Culliton told him it was in his car and that it had been in his hand when Fiddler "dragged" him from his car. (*Id.* at 23:26:16.) Fiddler again asked Culliton his name, and Culliton again would give only his first name. Fiddler testified that he decided to make a custodial arrest for resisting arrest, instead of just issuing a citation, after Culliton had refused multiple times to provide his name. (*See* Fiddler Dep. 25, Doc. No. 37, at 48 ("It was a misdemeanor that occurred in my presence, and given that he refused multiple times to provide me with his identity when asked, I ascertained that it was likely for the offense to continue.").) Despite having found that they were not tight, Fiddler loosened Culliton's handcuffs before putting him in the back of his patrol car. While being led to the back of the patrol car, Culliton said, "Every time I come to the fucking South with Colorado tags and Black Lives Matter, and they fucking pull me over for bullshit." (Video at 23:26:57.) Fiddler said, "Have a seat for just a moment, please." (*Id.*)

After placing Culliton in his patrol car, Fiddler called his supervisor, Sergeant Ricky Haley, to "keep him in the loop" and advise him that he was arresting an individual for resisting. (Fiddler Dep. 25, Doc. No. 37, at 48; Video at 23:30:24.) He then returned to the plaintiff and got him out of the patrol car. Before searching him, he moved him to the front of the vehicle, apparently so that the search would be recorded by the dash camera. (*See* Video at 23:30:53–55.) After the pat-down search, Fiddler walked Culliton back to the patrol vehicle.

---

[4] Fiddler testified that MPD policy required that "one finger shall be able to be placed between the wrist and the handcuff." (Fiddler Dep. 49, Doc. No. 37, at 53.)

Defendant Jeff Carroll, a sergeant with the MPD, arrived at the scene around that time and asked Culliton a few questions. The plaintiff again professed not to know what was going on, asserted that Fiddler never told him why he pulled him over, and complained that his wrists and arms were hurting from the handcuffs. Carroll asked him to exit the patrol car so he could check the handcuffs, and Carroll can be heard stating that cuffs were "really, really loose," "looser than [he] would have put them." (*Id.* at 23:37:01–23:37:13.)

Fiddler transported Culliton to the police department while his dash camera, without audio, continued to record. The Video reflects that Fiddler drove normally, with the flow of traffic, and did not make sharp turns or abrupt stops. The plaintiff disputes this, asserting that the Video shows that Fiddler made "a pretty abrupt stop" (Doc. No. 44, Pl.'s Resp. Statement Undisp. Fact ¶ 44), but the Video itself does not reflect that the stop was abrupt (*see* Video at 23:59:24).

Officer Thomas had pulled up and stopped behind Fiddler shortly after Fiddler pulled Culliton over. He can be seen approaching Culliton's passenger-side door while Fiddler reaches the driver's side door. (*See id.* at 23:23:39.) He is visible in much of the video, at Fiddler's side. In accordance with MPD policy, Officer Thomas performed an inventory search of Culliton's vehicle to remove personal items before the vehicle was towed. In conducting this search, he located a pre-rolled marijuana cigarette labeled "THC." In the trunk, he found seven containers labeled "THC" with marijuana inside and a digital scale. Thomas called Fiddler to notify him about the marijuana. Based on this information, Fiddler charged Culliton with violations of the following statutes: (1) Tenn. Code Ann. § 39-16-602 (resisting stop, frisk, halt, arrest or search); (2) Tenn. Code Ann. § 39-17-418 (simple possession of a controlled substance); and Tenn. Code Ann. § 29-17-425 (possession of drug paraphernalia).

Fiddler did not appear to testify at the preliminary hearing in Culliton's criminal case. He testified that he believed that no subpoena was issued, or in any event that he never received a subpoena. (Fiddler Dep. 50–51, Doc. No. 37, at 54–55.) The charges were dismissed for failure to prosecute.

B.      **The Investigation of the Plaintiff's Citizen Complaint**

On April 1, 2022, Culliton submitted a citizen complaint via an online portal on the City's website. (*See* Doc. No. 38-4.) His complaint "listed fourteen (14) issues with the [March 18, 2022 traffic] stop which he believes violated his first (1st) and fourth (4th) amendment rights," and he also complained that Support Specialist Cindy Beadle was rude to him when he picked up his personal belongings from the Property Division on March 21, 2022. (Doc. No. 38-5, at 1.) MPD Lieutenant Craig Snider investigated the plaintiff's complaint against Fiddler, Thomas, and Beadle. In conducting this investigation, Snider reviewed, among other things, Fiddler's dash camera footage (as well as audio/video from Thomas's and Carroll's dash or body cameras), and he interviewed both Fiddler and Thomas. At the conclusion of his investigation, he submitted a Memorandum to MPD Chief Michael Bowen dated May 19, 2022. (*See* Doc. No. 38-5.)

Snider's findings are articulated in the Memorandum. As relevant here, he found that (1) Fiddler did not violate any policy; (2) the traffic stop was legal; (3) Fiddler was polite and professional throughout the encounter; (4) nothing indicated that Fiddler intentionally drove in a manner to harm Culliton; and (5) Thomas was "less respectful," and, given that Culliton was "already upset," Thomas's "tone and demeanor did nothing to help Officer Fiddler, Mr. Culliton, or the situation." (Doc. No. 38-5, at 16.)

C.      **MPD Officer Training**

Regarding MPD officer training, the plaintiff admits the truth of the following statements:

(1) All MPD officers must be graduates of an approved law enforcement training academy and certified by the Peace Officers and Standards Training Commission ("P.O.S.T.").

(2) The curriculum at the law enforcement training academies typically lasts ten weeks and includes approximately 400 hours of extensive law enforcement training.

(3) Every MPD police officer must complete 40 hours of P.O.S.T-approved in-service training annually.

(4) In accordance with P.O.S.T. requirements, MPD officers are tested on their comprehension of topics covered during in-service training.

(5) Defendants Fiddler, Thomas, and Carroll are in compliance with in-service training requirements.

(6) The specifics of in-service training vary each year but always include topics dealing with the Fourth Amendment to the United States Constitution.

(7) In 2021, MPD officers received training in how the Fourth Amendment applies to arrests and seizures. This training discussed, in part, reasonable suspicion, probable cause, *Terry* stops, and exceptions to the misdemeanor citation rule. Fiddler, Thomas, and Carroll attended this in-service training class.

(8) MPD officers are provided with a copy of the police department's standard operating procedures (the "SOP") and are expected to become familiar with those policies.

(9) From time to time, provisions of the SOP are reviewed and discussed with officers as part of their ongoing in-service training.

(*See* Pl.'s Resp. to Defs.' Statement of Undisp. Material Facts ¶¶ 56–64, Doc. No. 44.)

**D.     This Lawsuit**

The plaintiff initiated this lawsuit on March 20, 2023, naming as defendants Officers Fiddler, Thomas, and Carroll, as well as the City. (Doc. No. 1.) Count I of the Complaint asserts several claims against all defendants under 42 U.S.C. § 1983, based on alleged violations of the plaintiff's rights under the Fourth Amendment. Within Count I, the plaintiff asserts that Fiddler and Thomas conducted an illegal search and seizure and "committed both false arrest and malicious prosecution," when they opened the plaintiff's car door without his consent, "grabb[ed]

the Plaintiff physically inside his car," handcuffed and arrested him, and charged him with resisting arrest, "all without probable cause." (Doc. No. 1 ¶¶ 62, 63.) Count I also asserts that Fiddler and Thomas used "unreasonable and excessive force" when they "handcuff[ed] the Plaintiff too tightly and thereby assault[ed] him." (*Id.* ¶ 64.)

Count I asserts the same false arrest, malicious prosecution, and excessive force claims against Jeff Carroll, on the basis that Carroll came to the scene as a supervisor and "expressly ratified the illegal acts while they were in progress." (*Id.* ¶ 65.)

Count I states an additional "false arrest and malicious prosecution" claim against Fiddler and Thomas, based on Thomas's informing Fiddler that he had found the marijuana and other things in Culliton's car and Fiddler's decision to charge the plaintiff with Simple Possession and Possession of Drug Paraphernalia, allegedly without probable cause.

Finally, Count I asserts that the City is liable for the "misconduct of all the individual officers" because it (1) "wrongly teaches its officers that they may charge someone with Resisting Arrest even without any force being used against the officers, and without knowing that they are being arrested"; (2) "fails to train and supervise its officers more generally to prevent civil rights abuses, and has ratified all these acts as consistent with policy"; and (3) showed "deliberate indifference to the rights of its citizens by hiring and retaining Officer Fiddler," despite his having previously been sued for civil rights violations and other alleged legal infractions. (*Id.* ¶¶ 67–69.)

Counts II and III of the Complaint sets forth claims against the three individual officer defendants for false arrest and malicious prosecution under state law.

Count IV states a claim against Fiddler under 42 U.S.C. § 1983 based on allegations that Fiddler took "adverse action against the plaintiff in retaliation for his protected speech," actions including the allegedly unwarranted traffic stop, false arrest, and malicious prosecution. (Doc. No.

1 ¶ 79.) The protected speech at issue is the plaintiff's display of political bumper stickers on his car, as well as his criticism of Fiddler's actions as illegal during the stop. (*See id.* ¶¶ 10, 52.)

On July 18, 2023, the defendants filed Answers to the Complaint and asserted various affirmative defenses, including qualified immunity. (Doc. Nos. 20, 21, 22.) The parties completed fact discovery without incident, and, in August 2024, the defendants filed their joint Motion for Summary Judgment with supporting Memorandum of Law, seeking judgment in their favor on all claims set forth in the Complaint. (Doc. Nos. 34, 38.) The defendants filed a Statement of Undisputed Material Facts (Doc. No. 36), in accordance with L.R. 56.01(b), along with copies of the exhibits cited therein. The plaintiff filed a Response in opposition to the motion and a Response to the defendants' Statement of Undisputed Facts, in accordance with L.R. 56.01(c), in which he concedes that most of the facts at issue are undisputed. (Doc. Nos. 45, 44.) The defendants filed a Reply brief. (Doc. No. 46.)

## III. DISCUSSION

### A. Fourth Amendment claims under § 1983

To prevail on a § 1983 claim, a plaintiff must prove two elements: (1) that he "was deprived of a right secured by the Constitution or laws of the United States," and (2) that he was "subjected or caused to be subjected to this deprivation by a person acting under color of state law." *Gregory v. Shelby Cnty.*, 220 F.3d 433, 441 (6th Cir. 2000). It is undisputed that the defendant police officers in this case acted under color of the laws of the State of Tennessee. Therefore, the focus of the court's inquiry is on whether the plaintiff can show that he was deprived of a right guaranteed to him by the United States Constitution.

In addition, however, state actors, including police officers, may be entitled to qualified immunity, even if they have violated the law. Qualified immunity is a judicially created doctrine that shields government officials "from liability for civil damages [under § 1983] insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In other words, Section 1983 claims against police officers who raise the defense of qualified immunity will fail unless the plaintiff shows both that "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *see also Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) ("[I]t is the plaintiff's burden to show that the [official is] not entitled to qualified immunity." (citation omitted)). The court may consider these two prongs in any sequential order. *Kennedy v. Cincinnati*, 595 F.3d 327, 336–37 (6th Cir. 2010); *Pearson*, 555 U.S. at 236.

"'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful." *Id.* at 63 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)) (some internal quotation marks omitted). To satisfy this standard, "existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Id.* (quoting *al–Kidd*, 563 U.S. at 741. This standard protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The plaintiff here raises false arrest, malicious prosecution, and excessive force claims under the Fourth Amendment, which guarantees individuals the right to be "secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Culliton protests essentially each action Fiddler took during the encounter leading to Culliton's custodial arrest, and the court analyzes each segment in assessing the reasonableness of Fiddler's (and the other

officers') actions. *Accord Hodge v. Blount Cnty.*, 783 F. App'x 584, 587 (6th Cir. 2019) ("We typically analyze excessive force cases in segments, and the officer's conduct must be reasonable at every stage.").

> 1. *False Arrest Claim Based on Fiddler's Opening the Car Door and "Grabbing" Culliton*

The plaintiff's first false arrest claim (against all defendants) is premised upon Fiddler's "opening the Plaintiff's car door without consent or probable cause and/or by grabbing the Plaintiff physically inside his car." (Doc. No. 1 ¶ 62.)

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Hart v. Hillsdale Cnty.*, 973 F.3d 627, 635 (6th Cir. 2020). Probable cause exists "when, at the time of the arrest, 'the facts and circumstances within [the officer's knowledge] and of which he had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offence.'" *Tlapanco v. Elges*, 969 F.3d 638, 652 (6th Cir. 2020) (quoting *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015)). "A showing of probable cause provides a complete defense to a claim of false arrest." *Id.* The plaintiff bears the burden to show the police lacked probable cause in order to prevail. *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir 2010).

With regard to claims of excessive force, it is well established that the "touchstone of [a court's] analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). And reasonableness "depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *Id.* at 109 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)).

Generally, when a motorist is stopped by the police, he, and all of his passengers, are "seized" within the meaning of the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 256–59 (2007). However, a police officer may permissibly stop a motorist when he possesses probable cause of a civil infraction or has reasonable suspicion of criminal activity. *United States v. Pacheco*, 841 F.3d 384, 389–90 (6th Cir. 2016). In addition, where a police officer has probable cause to stop a motorist for a traffic violation,[5] it is not unreasonable for him to order the motorist to get out of the car, as such "additional intrusion" on the motorist's personal liberty "can only be described as *de minimus*." *Mimms*, 434 U.S. at 111; *Pacheco*, 841 F.3d at 390 ("It also is well-established that, during a traffic stop, an officer may order passengers out of the vehicle pending the completion of the stop. The officers do not need independent justification to remove the driver or passengers from the vehicle." (internal citation omitted)). In light of *Mimms*, the Sixth Circuit has also recognized that, when a detainee refuses a direct order to step out of his vehicle, a police officer may be justified in "us[ing] enough force to get [him] out of the car," if the action is objectively reasonable under the circumstances. *Anderson v. Antal*, 191 F.3d 451 (6th Cir. 1999) (Table), 1999 WL 717993, at *4, 5 (6th Cir. Sept. 7, 1999).

In the present case, to be clear, Culliton apparently concedes that Fiddler had probable cause to pull him over for a traffic violation—both for the missing illumination over the license plate, *see* Tenn. Code Ann. § 55-4-110(c)(1), and his having witnessed Culliton driving erratically when he nearly struck Officer Thomas's car while pulling out of a parking lot. Culliton asserts,

---

[5] Based on the existence of probable cause to believe a violation of the Pennsylvania Motor Vehicle Code had been committed, the Court noted that, in the case before it, "unlike *Terry v. Ohio*, there [was] no question about the propriety of the initial restrictions on respondent's freedom of movement." *Mimms*, 434 U.S. at 109. At the same time, "[d]ue to their usually brief nature, traffic stops are more akin to the so-called '*Terry*' stop than a full-blown arrest." *Pacheco*, 841 F.3d at 390 n.1 (citations omitted)

however, that Fiddler's opening his car door and physically pulling him from the vehicle constituted an unreasonable seizure under the Fourth Amendment. While the Complaint does not expressly characterize Fiddler's act of pulling Culliton from the vehicle as involving excessive force, in his Response to the Motion for Summary Judgment, Culliton argues that it did— essentially because, in his view, the use of *any* force under the circumstances was unreasonable.

The court finds that both of Fiddler's actions were objectively reasonable under the circumstances, meaning that no constitutional violation occurred. First, although events moved quickly, there is no dispute that Fiddler had probable cause to stop Culliton for a traffic infraction. Then, when Culliton actively refused Fiddler's command to roll down his window, it was objectively reasonable for Fiddler to open Culliton's car door. Fiddler testified that he opened the door in part because he could not effectively communicate with Culliton and because he "needed to be able to speak with him to be able to determine if he was trying to conceal an odor of alcohol." (Fiddler Dep. 18, Doc. No. 37, at 44.) The court also notes that, as the Video confirms, it was dark, and a reasonable officer in Fiddler's position may well have had difficulty seeing inside the car— and, in particular, seeing the driver's hands—with the window most of the way up, which gave rise to legitimate safety concerns. *Accord Pacheco*, 841 F.3d at 390 (noting that "traffic stops are 'fraught with danger' for police officers" (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1983))). In addition, it was a very windy night, and the stop took place on the side of a busy road, which would have made communicating through a partially closed window even more difficult.

Second, it was also objectively reasonable for Fiddler to order Culliton out of the vehicle, based on *Mimms*, and to place his hand on Culliton's arm and pull him from the vehicle when Culliton loudly protested and made no move to comply with Fiddler's directive. Caselaw addressing an officer's use of force to remove a driver from a vehicle has typically involved

seriously injured plaintiffs and the question of whether the amount of force was excessive under the particular circumstances. *See, e.g.*, *Hodge v. Blount Cnty.*, 783 F. App'x 584, 588 (6th Cir. 2019) (finding that an officer used excessive force, and that the officer clearly should have known it was excessive, where the plaintiff only "passively resisted the officer's commands," but the officer "violently yanked [him] out of the vehicle, causing him to hit his head on the concrete pavement"); *Giannola v. Peppler*, 142 F.3d 433 (6th Cir. 1998) (Table) (per curiam), 1998 WL 96557, at *1 (6th Cir. Feb. 23, 1998) (denying summary judgment on excessive force claim based on the plaintiff's allegations that he was passively rather than actively resisting, and the officers "grabbed [him], pulled him out of the truck, pulled his jacket over his head, knocked him to the ground, and handcuffed him"). In this case, Culliton does not claim to have been harmed when Fiddler pulled him from the car, and the Video confirms that the use of force did not exceed that necessary to remove Culliton from the car, making this case far different from *Hodge* and *Giannola*. The use of force was not excessive under the circumstances.

Culliton asserts that Fiddler lacked probable cause to grab Culliton, or to search his car, "so long as he cooperated and ultimately accepted a citation." (Doc. No. 45, at 6–7.) But Culliton was not cooperating at that point—he was agitated and protesting loudly, proclaiming that he did not have to open his window and did not have to get out of his car, demanding to know what was going on, and talking over Fiddler when he tried to respond. And, while Fiddler did not give him much time to comply, he gave him some time to comply, and the plaintiff admittedly refused to roll down his window further and made no move to get out of the vehicle when directed to do so.

The plaintiff also argues that, under Sixth Circuit law, police should not use "any force at all, without first explaining to the suspect that he is under arrest." (Doc. No. 45, at 7 (citing *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009); *Atkins v. Twp. of Flint*, 94 F. App'x 342 (6th Cir.

2004)).) In fact, in *Grawey*, the court analyzed the objective reasonableness of the use of force based on the factors identified by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989): "1) the severity of the crime at issue; 2) whether the suspect posed an immediate threat to the safety of the police officer or others; and 3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Grawey*, 567 F.3d at 310 (citing *Graham*, 490 U.S. at 396). The evidence presented in that case, viewed in the light most favorable to the plaintiff, showed that the plaintiff did not know that he was under arrest when he ran away from a police officer and that the police officer used pepper spray on him when the plaintiff was standing with "his hands against the wall, after waiting for the officer to catch up to him, without any indication of resistance." *Id.* at 311. Citing *Atkins* and other cases, the court observed that "[a]n officer has used excessive force when he pepper sprays a suspect who has not been told she is under arrest and is not resisting arrest" and that, "even when a suspect verbally and physically resists arrest, the use of pepper spray may constitute excessive force." *Id.* Applying the *Graham* factors, the court found also that the use of force in that case was objectively unreasonable where the crime at issue was minor, the plaintiff was unarmed and did not pose an immediate threat to the officers at the time he was pepper sprayed, and the plaintiff was not actively resisting arrest. *Id.*

In concluding that the right of a submissive arrestee not to be pepper-sprayed was well established, the court also noted, in *dictum*, that "[t]he general consensus among our cases is that officers cannot use force, including pepper spray, on a detainee who has been subdued, is not told he is under arrest, or is not resisting arrest." *Id.* But this general consensus does not suggest that the use of "force" exerted by Fiddler in pulling Culliton from his car constituted excessive force or was unreasonable under the circumstances, for the same reasons set forth above: Culliton did not immediately comply with Fiddler's directives; he verbally insisted that he did not have to

comply; and the amount of force exerted by Fiddler was demonstrably *de minimis*. Moreover, to the extent Culliton complains that Fiddler did not tell him why he had been pulled over and that he was "confused about what was even going on"(Doc. No. 45, at 7), the Video reflects that Culliton's own actions prevented Fiddler from explaining why he had been pulled over initially, and Fiddler did eventually tell him why he had been pulled over—when he was able to get a word in edgewise.

The court finds, in sum, that no constitutional violation occurred when Fiddler opened Culliton's car door and grabbed him. Moreover, even if the plaintiff could establish a rights violation, he has not pointed to any caselaw suggesting either that a police officer's opening a car door (particularly when confronted with a driver who refused to roll his window down) or his use of minimal force to remove a driver from his vehicle when he refuses a direct command violates the Fourth Amendment. Because he has not pointed to any legal precedent that would have made it clear to Fiddler that "what he [was] doing [was] unlawful," *Wesby*, 583 U.S. at 63, Fiddler would be entitled to qualified immunity with respect to Culliton's claim that he "open[ed] the Plaintiff's car door without consent or probable cause and/or . . . grabb[ed] the Plaintiff physically inside his car" (Doc. No. 1 ¶ 62), even if his actions had arguably violated the Fourth Amendment.

Fiddler, therefore, is entitled to summary judgment on this claim. Because the claims against Thomas, Carroll, and the City are all based on the premise that Fiddler's actions violated the plaintiff's constitutional rights, the other defendants are also entitled to summary judgment on the plaintiff's claims arising from Fiddler's opening the plaintiff's car door and removing him from the car.

2.      *False Arrest and Malicious Prosecution Claims Based on Fiddler's Charging Culliton with Resisting Arrest*

The plaintiff next claims that Fiddler committed both false arrest and malicious prosecution when he arrested him for, and later formally charged him with, resisting arrest. (Doc. No. 1 ¶ 63.) As set forth above, a false arrest claim requires proof that the arresting officer lacked probable cause to arrest the plaintiff. *Hart*, 973 F.3d at 635. Likewise, a malicious prosecution claim requires, among other elements, a lack of probable cause for a criminal prosecution. *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). Accordingly, a showing of probable cause provides a "complete defense" to both claims. *Tlapanco*, 969 F.3d at 652.

The defendants argue that (1) the Video shows that the plaintiff physically resisted when Fiddler tried to pull him from his car, thus establishing sufficient physical "force," as defined by Tennessee law, Tenn. Code Ann. § 39-11-106(a)(14), to give rise to probable cause to arrest Culliton for resisting arrest, a Class B misdemeanor, Tenn. Code Ann. § 39-16-602(a); and (2) even if he lacked probable cause under § 39-16-602(a), Fiddler was also justified in arresting the plaintiff for refusing to identify himself, and an officer's "subjective reason for making [an] arrest need not be the criminal offense as to which the known facts provide probable cause" (Doc. No. 38, at 19 (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).

In response, the plaintiff argues that (1) a charge of resisting arrest under Tennessee law requires force, and there is no evidence that Culliton engaged in violence or physically resisted; (2) the crime of resisting arrest requires an "intentional *mens rea*," and it should have been clear to Fiddler that Thomas was visibly confused and "was not *intending* to do anything"; and (3) "the law in 2022 was clearly established that the police may not knowingly arrest someone based on fraudulent allegations." (Doc. No. 45, at 8 (citing *Caskey v. Fenton*, No. 22-3100, 2022 WL 16964963, at *7 (6th Cir. Nov. 16, 2022)).)

As an initial matter, the court notes that the plaintiff does not contend that his being handcuffed was, *per se*, a constitutional violation. Nor could he, in light of clearly established law that handcuffing a detainee does not ripen a stop into an arrest when a detainee is angry and raises his voice. *Accord O'Malley v. City of Flint*, 652 F.3d 662, 670–71 (6th Cir. 2011). Rather, the plaintiff contests the existence of probable cause to arrest him for resisting arrest.

Tennessee law makes it a crime "for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer . . . from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another." Tenn. Code Ann. § 39-16-602(a). For purposes of this provision, "'[f]orce' means compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." Tenn. Code Ann. § 39-11-106(a)(14). However, "'[p]assive resistance' generally does not constitute using force as contemplated by the preventing or obstructing an arrest statute." *State v. Burgess*, 532 S.W.3d 372, 393 (Tenn. Ct. Crim. App. 2017) (citing *State v. Corder*, 854 S.W.2d 653, 655 (Tenn. Ct. Crim. App. 1992) (concluding that a defendant's not moving and directing obscene language at officers were not sufficient to support a conviction for resisting arrest)). Rather, some active resistance to being detained or handcuffed is generally required. *See, e.g.*, *State v. Hart*, No. W2023-01103-CCA-R3-CD, 2024 WL 3273637, at *8 (Tenn. Ct. Crim. App. July 2, 2024) (upholding conviction for resisting arrest where the defendant pulled away and struggled with officers trying to detain him, and one officer's bodycam showed "the Defendant cursing and struggling to avoid being handcuffed"); *State v. Lindsey*, No. E2011-00052-CCA-R3CD, 2012 WL 5392156, at *6 (Tenn. Crim. App. Nov. 5, 2012) (affirming resisting arrest conviction based on evidence that officers had to "struggle" with the defendant to handcuff him and that he was "squirming on the ground, as if he was trying to crawl away from the officers,"

and collecting cases holding that "similar behavior on the part of the defendant" qualifies as force for purposes of a conviction for resisting arrest).

However, for purposes of the false arrest claim, the issue is not whether the evidence would support a *conviction* for resisting arrest under Tennessee law, but whether Fiddler had probable cause to arrest Culliton for resisting arrest or for any other "offense as to which the known facts provide probable cause." *Devenpeck*, 543 U.S. at 153; *see also Amis v. Twardesky*, 637 F. App'x 859, 861 (6th Cir. 2015) ("The officer can lawfully arrest the plaintiff so long as there is probable cause to arrest her for some crime, even if the crime for which there is probable cause is different from the stated crime of arrest."). Probable cause is "reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." *Sykes*, 625 F.3d at 306 (quoting *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005)). An officer "is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Amis*, 637 F. App'x at 861 (quoting *Everson v. Leis*, 556 F.3d 484, 499 (6th Cir. 2009)). Moreover, "even if a factual dispute exists about the objective reasonableness of the officer's actions, a court should grant the officer qualified immunity if, viewing the facts favorably to the plaintiff, an officer reasonably could have believed that the arrest was lawful." *Id.* (quoting *Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011)).

Here, as set forth above, it is not entirely clear from the Video what was happening inside Culliton's car after Fiddler directed him to get out, but it is apparent that Culliton objected verbally, and he physically, if briefly, resisted and tried to push away from Fiddler for seven or eight seconds before Fiddler was able to get him to stand up. (*See* Video at 23:24:51–23:24:59.) While Culliton denies having any "physical response" when Fiddler reached for him and asserts that he would not

"physically resist" someone with a gun, his version of events is not supported by the Video. (*See* Culliton Dep. 54, Doc. No. 37, at 16.) Even viewed in the light most favorable to the plaintiff, the court finds that Fiddler was objectively reasonable in believing that Culliton's physical resistance (however slight) constituted "physical power" sufficient to justify an arrest for resisting arrest. Culliton, moreover, has not pointed to any caselaw indicating that the exertion of this degree of physical power is *not* sufficient to support a charge or conviction for resisting arrest.[6]

Culliton's argument that resisting arrest requires an "intentional *mens rea*" and that he was demonstrably so confused that it should have been obvious to Fiddler he "was not intending to do anything" (Doc. No. 45, at 8) is without merit. Based on Culliton's vociferous protests and his actions in pushing away from Fiddler, Fiddler was objectively reasonable in believing that he did have the requisite intent. Nor has Culliton presented evidence that any police officer engaged in fraudulent representations, such as by making false statements on a warrant application, as would be required to support his argument that he was subject to a false arrest because "police may not knowingly arrest someone based on fraudulent allegations." (*Id.*)

Because the facts as viewed in the light most favorable to the plaintiff nonetheless establish that a police officer reasonably could have believed that the arrest for resisting arrest was supported by probable cause and therefore lawful, Fiddler is entitled to qualified immunity with respect to the plaintiff's false arrest and malicious prosecution claims that are premised upon his arresting

---

[6] In addition, although neither party points this out, Culliton could be deemed to have "interfered" with a police officer in violation of the Murfreesboro Code of Ordinances § 21-36, titled "Interference with or hindrance of police," pursuant to which it is "unlawful for any person to interfere with or to hinder any police officer, any member of the police department or any person duly empowered or vested with police authority in the discharge or apparent discharge of duty," even without the use of force. *See* https://library.municode.com/tn/Murfreesboro/codes /code_of_ordinances/378554?nodeId=PTIICO_CH21OFMIPR_ARTIINGE_S21-36INHIPO [https://perma.cc/2JNY-3AA3].

and charging the plaintiff with resisting arrest.[7] The court will grant summary judgment to Fiddler on this claim. Further, insofar as the claims against Thomas, Carroll, and the City are based on the premise that the arrest was unlawful, these defendants are also entitled to summary judgment on the Fourth Amendment claim arising from this action.

### 3. Fiddler's Charging Culliton for Simple Possession and Possession of Drug Paraphernalia

Culliton, after being taken into custody, was also arrested for possession of marijuana, in violation of Tenn. Code Ann. § 39-17-418, and possession of drug paraphernalia, in violation of Tenn. Code Ann. § 29-17-425. Culliton admits to transporting marijuana into Tennessee. (Culliton Dep. 61–62, Doc. No. 37, at 61–62.) In the Complaint and in his Response to the Motion for Summary Judgment, he maintains that he was permitted to possess marijuana in Tennessee because he legally purchased it Colorado with a medical marijuana prescription.

He is simply incorrect. Marijuana remains a Schedule VI controlled substance in Tennessee, Tenn. Code Ann. § 39-17-415(a)(1), and possession of marijuana for recreational or medical purposes remains illegal in Tennessee, Tenn. Code Ann. § 39-17-418(a). Axiomatically, it was not clearly established in March 2022 that possession of medical marijuana was legal in Tennessee. To the contrary, as the defendants point out, the Tennessee legislature failed to pass proposed legislation to amend Tenn. Code Ann. § 39-17-418(a) in 2017 by "designating the existing language as subdivision (a)(1)" and adding a "new subdivision (a)(2)," which would have created an exception to the prohibition on possession of small amounts of marijuana for any person who "[p]ossesses a valid medical marijuana identification card issued by any state" and "[o]btained

---

[7] Because there was probable cause for the arrest based on resisting arrest, the court does not reach the defendants' claim that the arrest was valid based on Culliton's refusal to identify himself. However, that issue is discussed below, in connection with the plaintiff's state law resisting arrest claim.

the marijuana pursuant to a valid physician's recommendation." Medical Marijuana Forgiveness Act, 2017 Bill Text TN S.B. 673, H.B. 860, https://www.capitol.tn.gov/Bills/110/Bill/HB0860 .pdf. In other words, the fact that Culliton had a Colorado prescription for marijuana did not make that prescription "valid" under Tennessee law or the possession of marijuana legal in Tennessee.

In short, the undisputed existence of marijuana and paraphernalia related to marijuana in the plaintiff's car provided probable cause to charge and prosecute the plaintiff on the simple possession and possession of paraphernalia.

### 4. Excessive Force – Handcuffing

The plaintiff also asserts that Fiddler used excessive and unreasonable force by handcuffing him too tightly "and thereby assaulting him." Doc. No. 1 ¶ 64.)[8]

"The Fourth Amendment prohibits officers from using more force than is 'objectively reasonable' under the circumstances." *Heeter v. Bowers*, 99 F.4th 900, 912 (6th Cir. 2024) (citations omitted). "The Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure." *Morrison v. Bd. of Trustees*, 583 F.3d 394, 401 (6th Cir. 2009). At the general level, this right was "clearly established" for qualified immunity purposes at the time of Culliton's seizure in 2022. *See id.* For his Fourth Amendment claim based on excessively tight handcuffs to survive summary judgment, Culliton must offer sufficient evidence to create a genuine issue of material fact that: (1) he complained that the handcuffs were

_____

[8] While he did not assert an excessive force claim in the Complaint based on Fiddler's manner of driving while transporting him to the police station, he apparently made such a contention in discovery. The defendants seek summary judgment on this claim, arguing that the Video shows that Fiddler did not drive in a manner intended to injure the plaintiff. (*See* Doc. No. 38, at 23.) Culliton did not respond to this argument, and the court finds that (1) the Complaint does not state a claim based on excessive force through intentionally erratic driving; (2) the Video affirmatively refutes any such claim; and (3) Culliton has apparently abandoned any attempt to bring such a claim if he did intend to bring one. The court will grant summary judgment on this claim without further discussion.

too tight; (2) the police officers ignored his complaints; and (3) Culliton experienced "some physical injury" resulting from the handcuffing. *Id.* (citing *Lyons v. City of Xenia*, 417 F.3d 565, 575–76 (6th Cir. 2005)). However, "even when a plaintiff makes this showing, a defendant officer may still be entitled to summary judgment on the basis of qualified immunity if it would not be clear to a reasonable officer that he was violating the plaintiff's rights." *O'Malley*, 652 F.3d at 671 (citing *Morrison*, 583 F.3d at 401).

In this case, there is no dispute that Fiddler complained about the handcuffs, and the defendants concede, at least for purposes of summary judgment, that Culliton complained that he had bruising and an indentation on his wrists. The defendants argue, however, that Culliton cannot show that the officers ignored his complaints. In response, the plaintiff asserts only: "The officers have all said that they cannot be guilty for the overly tight handcuffs because the handcuffs were not overly tight. However, Culliton says that they were overly tight. . . . [I]t should be up to a jury to decide who is telling the truth." (Doc. No. 45, at 11.)

The plaintiff, in other words, does not address the defendants' argument that they did not ignore the plaintiff's complaints and instead attempted to address them. The Video shows that, when Culliton complained, Fiddler almost immediately checked the handcuffs and determined that, in his view, they were not too tight, as he could fit two fingers inside them. When Culliton complained again, Fiddler loosened the handcuffs. The record does not reflect that Culliton continued to complain to Fiddler or Thomas, who was also present, after Fiddler loosened the handcuffs. It is true that, when Sergeant Carroll arrived on the scene, Fiddler complained again about the handcuffs. Carroll checked them again and found that they were "really, really loose," "looser than [he] would have put them." (Video at 23:37:01–23:37:13.) In other words, he did not ignore the plaintiff's complaints either. Thus, although there may be a factual dispute as to whether

the handcuffs were causing the plaintiff discomfort, that dispute is not material, because the plaintiff has not shown that the officers ignored his complaints or that their response to his complaints was objectively unreasonable. *See also O'Malley*, 652 F.3d at 672 ("[A] constitutional requirement obligating officers to stop and investigate each and every utterance of discomfort and make a new judgment as to whether the handcuffs are 'too tight' is neither reasonable nor clearly established[.]" (citation omitted)).

The court finds that the plaintiff has not shown that Fiddler or the other officers ignored the plaintiff's complaints or that they were objectively unreasonable in responding to those complaints. To the extent that there is a factual dispute as to whether the plaintiff continued to experience some discomfort related to the handcuffs even after they were loosened, he has not shown that the officers' response in checking for tightness, loosening the cuffs, and confirming that they were not too tight was unreasonable. The plaintiff has not shown that the officers violated his right to be free from the use of excessive force. The officers are entitled to qualified immunity, and summary judgment, as to this claim as well. Because no constitutional violation occurred, the City is also entitled to summary judgment on this claim.

### B.    State Law Claims – False Arrest and Malicious Prosecution

The false arrest claims against Fiddler, Thomas, and Carroll under state law are premised upon Fiddler's decision to perform a custodial arrest instead of issuing a citation for resisting arrest, in violation of Tennessee's "cite and release" statute, Tenn. Code Ann. § 40-7-118. The malicious prosecution claims are based on Fiddler's decision to charge the plaintiff for simple possession and possession of drug paraphernalia, allegedly without probable cause. The defendants move for summary judgment on these claims, first, on the basis that the court should decline to exercise supplemental jurisdiction over the state law claims if it has dismissed the federal claims over which it has original jurisdiction. However, as the plaintiff points out (Doc. No. 45, at 16), the court has

original diversity jurisdiction over the plaintiff's state law claims, as the parties are completely diverse (*see* Doc. No. 1 ¶¶ 2–6), and the amount in controversy exceeds the jurisdictional amount (*id.* at 15). 28 U.S.C. § 1332. This argument, therefore, is without merit.

The defendants also argue that they are entitled to common law immunity for discretionary functions that is "highly analogous" to the qualified immunity analysis that applies to § 1983 claims and that, when a court dismisses § 1983 claims based on qualified immunity, it should also grant qualified immunity to substantially identical state law claims. In response, the plaintiff concedes that the analysis of the malicious prosecution claim is "basically duplicative" of his Fourth Amendment malicious prosecution claim and that the court "may basically use the same analysis" of the state malicious prosecution claim. Based on this concession, because the court has found that the defendants are entitled to summary judgment on the federal malicious prosecution claim, it will grant summary judgment on the state malicious prosecution claim as well, without further discussion.

The plaintiff also contends, however, that the state false arrest claim "is substantially different" from its federal counterpart (Doc. No. 45, at 16.) In particular, Culliton asserts that the elements of a false arrest claim under Tennessee law are different from those under federal law and that federal claims are not subject to Tenn. Code Ann. § 40-7-118. The defendants, in the context of addressing the plaintiff's First Amendment retaliation claim, assert that this statute grants police officers the "discretion whether to issue a citation or make [a custodial] arrest . . . when '[a] reasonable likelihood exists that the arrested person will fail to appear in court'" and "requires that '[n]o citation shall be issued under this section if . . . there is a reasonable likelihood that the offense or crime would continue or resume.'" (Doc. No. 46, at 7 (quoting Tenn. Code Ann. § 40-7-118(c)(1) and (d)(2)).)

Under Tennessee law, the elements of a claim of false arrest—also called false imprisonment—are: "(1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint." *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990) (citing 32 Am. Jur. 2d False Imprisonment § 5 (1982)). The plaintiff here argues that his restraint in the form of a custodial arrest qualifies as detention against his will, for purposes of the first prong of a false arrest claim, and that it violated Tenn. Code Ann. § 40-7-118, for purposes of the second.

Section 40-7-118 "provides that an officer who observes the commission of certain misdemeanors *must cite and release* the misdemeanant rather than effecting a custodial arrest." *State v. Walker*, 12 S.W.3d 460, 462 (Tenn. 2000) (citing Tenn. Code Ann. § 40-7-118(b)(1)) (emphasis added). The statute provides several exceptions to the otherwise mandatory provision, *see* Tenn. Code Ann. § 40-7-118(b)(2), and it gives the officer discretion either to issue a citation ("may issue a citation") or to take the person into custody when the person is arrested on certain specified charges, none of which is at issue here. Tenn. Code Ann. § 40-7-118(b)(3).

Irrespective of the nature of the underlying misdemeanor, an officer "may arrest and take a person into custody" if there is a "reasonable likelihood" that the "arrested person will fail to appear in court." *Id.* § 40-7-118(c)(1). And an officer *must* make a custodial arrest, rather than issue a citation, under certain circumstances, including, among others, when "[t]here is a reasonable likelihood that the offense would continue or resume, or that persons or property would be endangered by the arrested person," or when "[t]he person arrested cannot or will not offer satisfactory evidence of identification." Tenn. Code Ann. § 40-7-118(d)(2) & (3).

The defendants' Reply, while referencing §§ 40-7-118(c)(1) and (d)(2),[9] does not actually attempt to justify the application of these subsections to the plaintiff's custodial arrest. That is, they make no factual showing that Fiddler reasonably believed that there was a likelihood that the plaintiff, merely by virtue of being a Colorado resident, would fail to appear in court, as required by § 40-7-118(c)(1); they do not explain what offense the plaintiff had committed that was reasonably likely to "continue or resume"; and they do not argue that he posed a danger to persons or property, for purposes of § 40-7-118(d)(2).

Fiddler himself, moreover, testified only that it was within his discretion to take Culliton to jail, rather than citing and releasing him, for resisting arrest. (Fiddler Dep. 24, Doc. No. 37, at 47.) He also stated that he decided to effect a custodial arrest because a misdemeanor had occurred in his presence and, "given that [Culliton] refused multiple times to provide me with his identity when asked," Fiddler "ascertained that it was likely for the offense to continue." (*Id.* at 25, Doc. No. 37, at 48.) In other words, Fiddler appears to have relied on § 40-7-118(d)(3)—perhaps combined with the continuing offense provision in subsection (d)(2)—to justify the custodial arrest. Subsection (d)(3) *requires* a custodial arrest if a person "cannot or will not offer satisfactory evidence of identification." Tenn. Code Ann. § 40-7-118(d)(3). But, based on clearly established Tennessee law, Culliton's mere refusal to provide his full name did not justify a custodial arrest under the circumstances of this case.

In 2000, the Tennessee Supreme Court construed the "cite and release" statute as "creat[ing] a presumptive right to be cited and released for the commission of a misdemeanor,"

---

[9] The defendants' Memorandum does not mention subsection (d)(3) except inferentially, when they justify Culliton's arrest as valid under the Fourth Amendment, in the alternative, on his failure to identify himself. (*See* Doc. No. 38, at 18–19 ("Ofc. Fiddler could have arrested Plaintiff for failing to identify himself. Plaintiff refused two requests to provide his name.").)

unless one of the statutory exemptions exists. *State v. Walker*, 12 S.W.3d 460, 464 (Tenn. 2000). In *Walker*, the defendant was charged with violation of a municipal noise ordinance. When asked for identification, he responded that he did not have his driver's license on him, but he gave his name, date of birth, and driver's license number, and he offered to go home—two blocks away—to get his license. *Id.* at 463. Although the dispatcher verified his information, the arresting officer decided it was insufficient and took the defendant into custody for violating the noise ordinance. When the officer conducted a search incident to the arrest, he found marijuana and cocaine on the defendant. *Id.* The defendant sought suppression of this evidence. The trial court granted the motion, but the appellate court reversed on the grounds that the defendant had failed to provide the police officer with satisfactory evidence of identification. The Tennessee Supreme Court granted review and reversed.

The Tennessee Supreme Court noted that the case required it to decide what the standard was "for determining what constitutes 'satisfactory evidence of identification' under Tenn. Code Ann. § 40-7-118([d])(3)." *Id.* at 464.[10] The court held that an objective standard applied and that, under this standard, the state has the burden of proving that "it was objectively reasonable for the officer to reject a misdemeanant's proffered identification evidence." *Id.* "By objectively reasonable, we mean that in rejecting the evidence, the officer should have a specific articulable reason to doubt that the cited person has accurately identified himself [or herself] before taking him [or her] into custody." *Id.* (internal quotation marks and citation omitted) (alterations in original).

The court explained that

---

[10] Walker cites subsection (c)(3), because, in 2000, subsection (d)(3) was codified at (c)(3). The statute was amended in 2019 to insert a new subsection (c), and what was subsection (c) became subsection (d). 2019 Tennessee Laws Pub. Ch. 316 (S.B. 587).

Tennessee's "cite and release" statute works on an "honor system," operating under the assumption that the misdemeanant will act in good faith by furnishing accurate identification so that an officer can be assured that the misdemeanant is actually the person he or she claims to be. The exception empowers an officer to effect a custodial arrest only when the identity of a misdemeanant is in doubt . . . . To this end, an officer's discretion is limited. *An officer may not make unreasonable or arbitrary determinations as to what constitutes satisfactory evidence of identification*.

*Id.* at 466 (emphasis added).

The court found that, under the circumstances presented there, it was objectively unreasonable for the police officer to reject the verbal evidence offered by the defendant as proof of his identification, particularly given that the information given by the defendant was verified by the dispatcher. The court therefore concluded that, "under Tenn. Code Ann. § 40-7-118([d])(3), [the police officer] wrongly placed Walker under custodial arrest." *Id.* at 468.

Based on *Walker*, the court finds that, insofar as the custodial arrest was premised upon Culliton's refusal to provide anything but his first name when Fiddler asked him to identify himself, but while also informing Fiddler that his driver's license was in his wallet, which was in the car, Fiddler's decision to take him into custody at that moment based on his purported refusal or inability to "offer satisfactory evidence of identification," Tenn. Code Ann. § 40-7-118(d)(3), was objectively unreasonable. And this was the only "continuing violation" identified by Fiddler.

Accordingly, *Walker* establishes that Fiddler's decision to effect a custodial arrest of Culliton—based on his misdemeanor resisting arrest and supposedly refusing to identify himself— violated Tennessee state law. The evidence is sufficient, that is, to establish the second element of a state law false arrest/false imprisonment claim as well: "the unlawfulness of [the plaintiff's] detention or restraint." *Coffee*, 795 S.W.2d at 659. Moreover, because this rule of law was clearly

established as of 2000, when *Walker* was issued, Fiddler is not entitled to qualified immunity—or summary judgment—on this claim.[11]

The question remains whether Thomas and Carroll are entitled to summary judgment on this claim. The Complaint alleges that Fiddler and Thomas both were involved in performing the custodial arrest and, therefore, that Thomas also committed false arrest. Thomas testified that he did not recall having any discussion with Fiddler about whether to perform a custodial arrest as opposed to issuing a citation, and Fiddler likewise testified that he made the decision to take Culliton into custody and did not discuss it with Thomas. (Thomas Dep. 6, Doc. No. 37, at 60; Fiddler Dep. 51, Doc. No. 37, at 55.) However, it is clear from the Video that Thomas was present for the entirety of the encounter, and he remained behind with Culliton's car after Fiddler took Culliton into custody, dealing with having the vehicle towed, securing Culliton's personal effects, and making sure his dog was taken care of while Culliton went to jail. Given that the defendants do not posit any basis for summary judgment as to the state law false arrest claim against Thomas apart from the same qualified immunity argument they raise in defense to the federal false arrest claim, the court finds that they have not affirmatively established that Thomas is entitled to summary judgment on the state law false arrest claim.

Carroll, however, arrived late and left early from the scene. Culliton testified that he did not speak to Carroll about his arrest but only about his handcuffs, and Carroll left before Culliton was actually transported to jail. (Culliton Dep. 68, Doc. No. 37, at 19.) From the plaintiff's

---

[11] It bears noting that a custodial arrest for a misdemeanor does not violate federal law, even if it may violate state law. The Supreme Court has held unequivocally that "warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections.." *Virginia v. Moore*, 553 U.S. 164, 176 (2008); *United States v. Macklin*, 819 F. App'x 372, 377 (6th Cir. 2020).

perspective, he believed that Carroll had "spoken with Officer Fiddler, and they had decided to take me to jail" (*id.* at 69, Doc. No. 37, at 20), but he has no evidence to support that belief, and Fiddler testified that he did not discuss his decision to take Culliton to jail with Carroll (Fiddler Dep. 51, Doc. No. 37, at 55). Thus, the available evidence indicates that Carroll was not present when the events that led Fiddler to decide to make a custodial arrest transpired or when Fiddler actually made that decision; Carroll was not consulted about the decision, and he left before its culmination. Under these circumstances, it does not appear that Carroll was in a position to second guess Fiddler's decision to take Culliton into custody, and he did not participate in it. Because there is no evidence in the record that Carroll had any involvement in the decision to take Culliton into custody or in the act of taking him into custody, Carroll is entitled to summary judgment on the state law false arrest claim.

### C.     First Amendment Claim Against Fiddler

"'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). To survive summary judgment on this claim, the plaintiff must present facts from which a jury could find that (1) "he engaged in constitutionally protected speech," (2) "he suffered an adverse action likely to chill a person of ordinary firmness from continuing to engage in protected speech," and (3) "the protected speech was a substantial or motivating factor in the decision to take the adverse action." *Wood v. Eubanks*, 25 F.4th 414, 428 (6th Cir. 2022). In addition, the plaintiff generally must also "plead and prove the absence of probable cause for the arrest" to sustain a First Amendment retaliation claim. *Id.* at 428 n.4 (quoting *Nieves*, 587 U.S. at 402).

In *Nieves*, however, the Supreme Court also recognized a "narrow exception to the no-probable-cause rule." *Gonzalez v. Trevino*, 602 U.S. 653, 664 (2024) (per curiam) (Alito, J., concurring) (citing *Nieves*, 587 U.S. at 406). Specifically, the Court noted in *Nieves* that, while

> probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so. In such cases, an unyielding requirement to show the absence of probable cause could pose "a risk that some police officers may exploit the arrest power as a means of suppressing speech."

*Nieves*, 587 U.S. at 406 (quoting *Lozman v. Riviera Beach*, 585 U.S. 87, 99 (2018)).

The Court noted in particular that, when § 1983 was adopted, "officers were generally privileged to make warrantless arrests for misdemeanors only in limited circumstances." *Id.* at 407. "Today, however, statutes in all 50 States and the District of Columbia permit warrantless misdemeanor arrests in a much wider range of situations—often whenever officers have probable cause for even a very minor criminal offense." *Id.* (internal quotation marks and citations omitted). For example, the Court explained:

> at many intersections, jaywalking is endemic but rarely results in arrest. If an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest. In such a case, . . . probable cause does little to prove or disprove the causal connection between animus and injury . . . .

*Id.* Therefore, the no-probable-cause requirement may be set aside "when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 407.

In the present case, Fiddler does not dispute that the plaintiff engaged in protected speech by displaying political bumper stickers and engaging in political speech when he was arrested—for instance, by "call[ing] the officers fascists during their interactions." (Doc. No. 38, at 25.) He

asserts that, because he had probable cause to initiate the initial traffic stop and then probable cause to charge the plaintiff with resisting arrest, failing to identify himself, and possession of marijuana and paraphernalia, Fiddler did not violate a clearly established First Amendment right at the time of the incident in March 2022.

The court has already found that Fiddler had probable cause to effect the initial traffic stop, which the plaintiff concedes, as well as probable cause to charge the plaintiff with resisting arrest and, once the marijuana was discovered, on the marijuana-related charges. Ordinarily, the finding of probable cause is dispositive of the First Amendment retaliation claim as well. *See Novak v. City of Parma*, 932 F.3d 421, 429 (6th Cir. 2019)).

To avoid that result, the plaintiff must produce "objective evidence that he was [custodially] arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Gonzalez*, 602 U.S. at 655 (quoting *Nieves*, 587 U.S. at 407). In *Gonzalez*, for example, the plaintiff, who was arrested and taken into custody for allegedly tampering with government records, presented evidence in the form of a review of a decade's worth of misdemeanor and felony data for the county in which she was arrested, which confirmed that the anti-tampering statute had "never been used in the county 'to criminally charge someone for trying to steal a nonbinding or expressive document.'" *Id.* at 657. The Court found that the plaintiff's "survey evidence is a permissible type of evidence because the fact that no one has ever been arrested for engaging in a certain kind of conduct . . . makes it more likely that an officer *has* declined to arrest someone for engaging in such conduct in the past." *Id.*

In the present case, the plaintiff has established as a legal matter that officers in Tennessee are required to cite and release individuals who commit a misdemeanor in their presence unless one of the exceptions in the cite-and-release statute applies. The defendants have not shown that

any exception applied here. Further, under clearly established Tennessee law, the plaintiff's refusal to provide his last name—while also proffering his driver's license—did not make him a person who "cannot or will not offer satisfactory evidence of identification" for purposes of Tenn. Code Ann. § 40-7-118(d)(3). What the plaintiff has not done, however, is proffer any objective evidence establishing that, irrespective of the governing law, officers (and particularly police officers in Murfreesboro, Tennessee) who arrest individuals for resisting arrest typically do not take them into custody unless aggravating factors not at issue here are present.

Requiring such objective evidence seems unnecessary where, as here, state law *requires* officers to cite and release a suspect for a misdemeanor offense, rather than a custodial arrest, unless a specific exception applies. The Supreme Court, however, has not qualified the requirement: "To fall within the exception, a plaintiff must produce evidence to prove that his arrest occurred" under "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Gonzalez*, 602 U.S. at 658 (quoting *Nieves*, 587 U.S. at 406)."The only express limit [*Nieves*] placed on the sort of evidence a plaintiff may present for that purpose is that it must be objective in order to avoid 'the significant problems that would arise from reviewing police conduct under a purely subjective standard.'" *Id.* (quoting *Nieves*, 587 U.S. at 407).

The plaintiff has not argued that such statistical evidence does not exist or that he cannot obtain it. Nor has he argued that such evidence is unnecessary under governing precedent in light of Tennessee's cite-and-release statute. Given the Supreme Court's express directive and the plaintiff's failure either to proffer any objective evidence of any kind to satisfy *Nieves* or to argue that such evidence is unnecessary, Fiddler is entitled to summary judgment on the First Amendment retaliation claim.

## IV.     CONCLUSION

The defendants' Motion for Summary Judgment (Doc. No. 34) will be granted in part and denied in part. The motion will be granted with respect to the claims against defendants Jeff Carroll and the City of Murfreesboro, and all claims against those defendants will be dismissed. The motion will be granted with respect to all claims against defendants Casey Fiddler and Michael Thomas *except* the state law false arrest claim. All other claims will be dismissed.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge